UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:

THE A MEN OF SARASOTA, INC.
d/b/a HEAL STRONG,

      Debtor.

_____/

THE A MEN OF SARASOTA, INC.
d/b/a HEAL STRONG, and
NICHOLAS ANGELASTRO, individually,

      Plaintiff,

v.

CYNOSURE, LLC,
a Massachusetts limited liability company,

      Defendant.

_____/

Case No.:     8:22-bk-02849-CPM
Chapter:     11

Adv. Case No.: _____

## **COMPLAINT**

COMES NOW the Plaintiffs, the A MEN OF SARASOTA, INC. and DR. NICHOLAS ANGELASTRO (the "Plaintiffs"), by and through their undersigned counsel, and pursuant to 11 U.S.C. § 105, Fed. R. Bankr. P. 7001(1), and M.D. Fla. L. R. 7001-1 files this Complaint and sues Defendant CYNOSURE, LLC (the "Defendant"). Plaintiffs allege as follows:

### **PARTIES, JURISDICTION, AND VENUE**

1.     This is an adversary proceeding within the meaning of Rule 7001 of the Federal Rules of Bankruptcy Procedure.

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 157(a); 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

3.    Plaintiff, THE A MEN OF SARASOTA (the "A MEN"), is an active Florida corporation with its principal place of business at 1511 Tamiami Trail S., Suite 201, Venice, Florida 34284, with a mailing address of 3604 Torrey Pine Blvd., Sarasota, Florida 34238.

4.    Plaintiff NICHOLAS ANGELASTRO ("Angelastro") is an individual who resides in Florida, is a medical doctor, serves as a managing member of A MEN, and is otherwise *sui juris*.

5.    Defendant CYNOSURE, LLC ("Cynosure") is a Delaware company with its principal place of business located at 5 Carlisle Road, Westford, Massachusetts 01886.

6.    At all times material, Cynosure solicited and transacted business in the State of Florida, including selling, negotiating, and contracting for the sale of equipment and related services in the State of Florida.

7.    Upon information and belief, Cynosure maintains agents and representatives in Florida that Cynosure employs to solicit, negotiate, and interact with potential and current customers, including Plaintiffs, in order to convince them to purchase Cynosure products and enter into agreements with Cynosure.

8.    Cynosure enters into contracts in Florida.

9.    Jul 15, 2022, Plaintiff A Men filed for Chapter 11 bankruptcy in the Middle District of Florida, Tampa Division, Case No.: 8-22-bk-02849-CPM (the "Bankruptcy").

10.    The parties are diverse, and the amount in controversy exceeds $75,000, exclusive of interest and fees. 28 U.S.C. § 1332.

11.    Venue is proper in the Middle District of Florida, Tampa Division. 28 U.S.C. § 1409.

## PRELIMINARY STATEMENT

12.     The Defendant in this action is in the business of promoting and selling various medical laser products that can be applied to a variety of patients' concerns. At issue in this matter are certain products that were promoted and sold to Plaintiffs as essential to an aesthetics practice. Defendant's sales approach is to promise its customers that they will see record profits, have an almost endless supply of happy patients, and the guaranteed assistance of an excellent and dedicated marketing team – all working to see Cynosure's customers succeed. Instead, what Cynosure delivers are complicated products that are difficult to use and operate safely and subpar marketing assistance that does little or nothing to assist their clients. All this while reaping the benefits of having been paid for their equipment by a third-party financing company and receiving ongoing payments from customers in the form of supplies, marketing materials, and warranty payments.

## FACTS

13.     Plaintiff A MEN is a Florida corporation which incorporated in 2006 and does business under the name Heal Strong.

14.     Since its incorporation, A MEN has been operated by Dr. Angelastro, the president.

15.     A MEN is a primary care and walk-in clinic offering primary care medicine and urgent care/walk-in services such as tending to sprains and fractures, medicating colds and cases of flu, Covid-19 testing, drug and alcohol screenings, and other services.

### *Meeting Cynosure*

16.     In May 2020, Plaintiffs were approached by a Cynosure representative, Kyle Shapero, via phone to discuss expanding the range of services A MEN offered to patients to include Aesthetics.

17.     Aesthetics are treatments provided to patients that use lasers or radio waves to firm and tighten skin, remove discolorations, sculpt and remove body fat, flatten fine lines and wrinkles, and a variety of other skin treatments designed to improve a patient's appearance.

18.     On or as of June 4, 2020, Plaintiff had their first in-person contact with a Cynosure representative, Jamie Levine (the "First Meeting").

19.     The First Meeting consisted of discussing what Aesthetics equipment was available that applied to the Plaintiffs' needs for a budding aesthetics practice at a small clinic.

20.     June 4, 2020, following the First Meeting, Cynosure's representative, Jamie Levine, followed up with an email with a "bridge application" through which A MEN could be preapproved for credit to purchase aesthetics equipment. **A true and correct copy of the June 4, 2020, email is attached hereto as Exhibit A.**

### *The TempSure Equipment*

21.     On or as of June 8, 2020, Plaintiff had an in-person meeting with Cynosure representative, Kyle Shapero. The purpose of the June 8 Meeting was to discuss a Cynosure product called TempSure.[1]

22.     Cynosure promotes the TempSure product, *inter alia*, as a means to apply heat deep into a patient's skin to regenerate collagen and reduce the appearance of forehead wrinkles, frown lines, crow's feet, and smile lines.[2]

23.     At the June 8, 2020, meeting, Cynosure's representative, Kyle Shapero, represented to Dr. Angelastro that the potential profit from the TempSure was unlimited because people were spending billions of dollars on their appearance to appear attractive on social media.

---

[1] Cynosure's official name is TempSure RF Generator with TempSure Envi Face Application. https://www.cynosure.com/product/tempsure-platform/tempsure-envi/
[2] https://www.cynosure.com/product/tempsure-platform/tempsure-envi/

24.     On or as of June 10, 2020, Plaintiff Angelastro received a phone call from Dr. Steven Caridi (the "Physician"), who practiced in the Boca Raton area of Florida. The Physician described Cynosure's TempSure product as "making him a small fortune," that TempSure "ballooned his practice," and that "people were interested."

25.     The Physician also represented that the addition of the TempSure product had added $20,000 in revenue to his practice per month.

26.     On the same June 10, 2020, phone call, the Physician made clear that Cynosure's marketing was crucial to his success with TempSure and to use the marketing.

27.     Upon information and belief, the Physician's testimonial was engineered by Cynosure.

28.     During the purchase period for the TempSure, Cynosure's representative, Kyle Shapero, made it known to Dr. Angelastro that there was a skin-firming component of the TempSure called Flexsure, which as of the June 17, 2020, Meeting, was a new feature, and that if Dr. Angelastro were to purchase the Flexsure, he would be the first doctor in Florida to have the skin-firming component (the "Flexsure").

29.     On or as of June 10, 2020, Defendant's representatives made clear to Plaintiffs that the TempSure with Flexsure was easy to use, required minimal training to learn, and the treatments could be applied to a patient with little or no staff supervision and monitoring.

30.     Intrigued by the possibility of beginning his Aesthetics practice and in reliance upon the representations made by Cynosure's representatives and the Physician as to the profitability and efficacy of the TempSure with the Flexsure component, Angelastro agreed to purchase the TempSure and Flexsure.

31.     On or as of June 18, 2020, the TempSure was purchased from Cynosure and financed through JB&B Capital, LLC. Ex. B.

32.     The JB&B Equipment Finance Agreement describes the TempSure as follows: 675-7027-002: Tempsure RF Generator with Tempsure Envi Face Application and Tempsure Vitalla Small Area Treatment Application, with all other parts and attachments listed on Cynosure LLC's Invoice Number 40060680A Dated 16-Jun-20. Ex. B.

33.     On or as of June 25, 2020, JB&B perfected its security interest by filing a UCC-1 Financing Statement with the State of Florida. Ex. B.

34.     The total financed cost of the TempSure was $107,535.00. Ex. B.

35.     Dr. Angelastro personally guaranteed the TempSure payments. Ex. B.

36.     On or as of July 2, 2020, Cynosure's clinical support staff provided training on the TempSure to Dr. Angelastro and his wife, Ann.

37.     The TempSure/Flexsure training consisted only of four hours in the morning and another two in the afternoon.

38.     From the TempSure/Flexsure training, it became apparent to Plaintiffs that the operation of the TempSure/Flexsure would require that A Men personnel continuously monitor and supervise patients during the entirety of their TempSure/Flexsure procedures.

39.     Throughout the TempSure/Flexsure training, Cynosure's representatives promoted additional Cynosure products and the marketing plan.

40.     Dr. Angelastro and his staff found the TempSure/Flexsure training to be hurried and that it provided only rudimentary instruction on safely using and operating the equipment.

41.     The training required that Plaintiffs learn the TempSure/Flexsure through their own reading and earning online certificates with Cynosure.

42.     On or as of December 21, 2021, JB&B Capital and A Men, by and through Angelastro, agreed to amend the June 18, 2020, Equipment Finance Agreement to: (1) defer payments from October and November 2021; (2) adjust the December 2021 payment by reducing it to an interest only payment of $1,091.73; (3) 47 remaining monthly payments in the amount of $2,642.61 commencing January 14, 2022; and (4) all payments to made by ACH transactions. **True and correct copies of the JB&B Capital Equipment Finance Agreement, UCC-1, and Amendment to Equipment Finance Agreement dated June 18, 2020, are attached hereto as Composite Exhibit B.**

43.     Dr. Angelastro personally guaranteed the TempSure payments. Ex. B.

44.     Plaintiffs eventually defaulted on their payments for the TempSure/Flexsure.

45.     The TempSure/Flexsure remained in possession of Plaintiff following the filing of the A Men Bankruptcy.

46.     August 5, 2022, JB&B Capital was granted relief from the Bankruptcy's automatic stay and allowed to proceed with state law remedies as to the TempSure. (Bankr. Docs. 45 and 48, respectively).

47.     The TempSure has been repossessed and, upon information and belief, sold.

### *The Icon Workstation*

48.     On or as of July 27, 2022, Cynosure's representative, Kyle Shapero, had an in-person meeting with Dr. Angelastro at A Men's office to discuss the Icon Workstation (the "Icon").

49.     Cynosure describes the Icon as "Our Icon aesthetic system offers something for nearly every patient you treat. With seven handpieces, over 80 publications, and countless provider

success stories – this flexible multi-purpose platform is an industry must-have for practitioners both new and experienced."[3]

50.     Cynosure promotes the Icon for treatments of, among others: (1) Facial vessel clearance and pigment reduction; (2) Surgical and acne scar treatment; (3) Stretch mark treatment; (4) Wrinkle reduction; (5) Leg vein clearance; (6) Permanent hair reduction; and (7) Fractional skin resurfacing.[4]

51.     Plaintiffs were interested in the Icon primarily for stretch mark treatments.

52.     On or as of July 27, 2020, Cynosure's representative, Kyle Shapero, promoted the Icon as the centerpiece of Cynosure's line.

53.     Similar to the TempSure, Cynosure's representative, Kyle Shapero, promoted the Icon as essential to growing an aesthetics practice because of the wide variety of treatments it could provide.

54.     Cynosure's representatives promoted the Icon as easy to use, that it would generate revenue and profits for Plaintiff's business and that the Cynosure marketing plan would generate patient interest, which would translate to leads and sales.

55.     Dr. Angelastro agreed to purchase the Icon.

56.     Upon information and belief, the Icon was financed through LeasePoint Funding, LLC, who assigned or otherwise transferred the financing agreement to Centra Funding, LLC.  Ex. C.

57.     June 23, 2022, Centra Funding, LLC filed a UCC-1 with the State of Florida's Secured Transactions Registry along with an Invoice for the Icon and accessories.  **A true and**

---

[3] https://www.cynosure.com/product/palomar-icon-aesthetic-system/
[4] https://www.cynosure.com/product/palomar-icon-aesthetic-system/

correct copy of the Centra Funding, LLC UCC-1, Cynosure Invoice, and Leasepoint Financing Agreement are attached hereto as Composite Exhibit C.

58.     Angelastro personally guaranteed the Icon's payments.

59.     On or as of August 7, 2022, Cynosure provided a second training on the TempSure/Flexsure and a first training on the Icon.

60.     The Icon did not perform to Plaintiff's expectations or in conformity with the representations made by Cynosure's representatives. The Icon was difficult to use to the point of becoming a safety concern for patients, it required A Men personnel to be present throughout the duration of a patient's treatment, and patients required continuous monitoring and supervision.

61.     The Icon did not generate the revenue that was promised by Cynosure's representatives.

### *The Potenza Workstation*

62.     Late July 2020, Cynosure's representative, Kyle Shapero, contacted Dr. Angelastro via telephone to inform him that a Potzena Workstation that he had sold to a provider in Nashville, Tennessee could not be delivered.

63.     Late July 2020, Cynosure's representative, Kyle Shapero, offered to sell Plaintiffs the Potenza Workstation for the used price.

64.     Cynosure promotes the Potenza Workstation as "The world's first RF microneedling system that combines monopolar and bipolar RF at 1 or 2MHz frequencies in a single device."[5] And as "The New Standard in RF Microneedling with revolutionizing enhanced topical penetration."[6]

---

[5] https://www.cynosure.com/product/potenza/
[6] https://www.cynosure.com/product/potenza/

65.     The purpose of the Potenza Workstation is to use radio frequencies and tiny needles to cause micro-insular and subcutaneous punctures to initiate the body's healing response thereby inserting collagen and elastin into the skin to remove fine lines and wrinkles and create a more youthful appearance.

66.     Cynosure's representative, Kyle Shapero, stated that the Potzena Workstation was a means to generate $20,000 per month in revenue for A Men.

67.     Plaintiffs agreed to purchase the Potenza Workstation from Cynosure.

68.     On or as of July 27, 2020, A Men entered into an Equipment Finance Agreement with MMP Capital, Inc., pursuant to which MMP agreed to provide A MEN with financing to enable it to purchase the Potenza Workstation, S/N PCIJ19019. **A true and correct copy of the MMP Agreement for the Potenza Workstation is attached hereto as Exhibit D.**

69.     The MMP Capital Agreement required A Men to make six consecutive monthly payments of $99.00, followed by sixty consecutive monthly payments of $4,069.22 commencing August 1, 2020, and continuing monthly through January 1, 2026. Ex. D.

70.     On or as July 27, 2020, Angelastro signed the MMP Agreement and personally guaranteed the Potenza Workstation payments. Ex. D.

71.     On or as of July 29, 2020, MMP duly assigned all right, title and interest in the MMP Agreement to Amur Equipment Finance, Inc. **Ex. D.**

72.     Amur perfected its interest by filing a UCC-1 with the Secretary of State of Florida. **Ex**. D.

73.     Shortly after the Potenza Workstation was delivered it became apparent to Plaintiffs that it did not meet the expectations set by Cynosure's representatives.

74.     The Potenza Workstation was complicated to use, required constant patient monitoring and supervision, and did not return the promised revenues.

75.     In fact, some procedures required the patients to be sedated with the use of nitrous oxide, mandating that Plaintiff's personnel be present at all times during a procedure.

76.     Several patients complained of pain from using the Potenza Workstation's procedures, even under the administration of nitrous oxide.

77.     Plaintiff defaulted on the payments on the Potenza Workstation.

78.     On or as August 5, 2021, Amur brought suit in the Supreme Court of the State of New York, County of Nassau, Index No.: 609981/2021, against A Men and Dr. Angelastro to recover the Potenza Workstation and to enforce the personal guaranty.

79.     On or as August 4, 2022, In the Bankruptcy, Amur motioned for and was granted relief from stay to repossess the Potenza Workstation. (Bankr. Docs. 40 and 56, respectively).

80.     Amur has repossessed the Potenza Workstation and, upon information and belief, it has been sold realizing only a fraction of the funds Cynosure received.

### *The SculpSure Equipment*

81.      In late August 2020, Dr. Angelastro attended an Aesthetics Exchange conference hosted by Cynosure at the Ritz Carlton Hotel in Naples, Florida.

82.     At the Aesthetics Exchange, Dr. Angelastro saw a Cynosure product called SculpSure.

83.     Cynosure describes and promotes the SculpSure as a device that practitioners can "provide treatments for non-invasive body contouring that permanently reduces stubborn fat without surgery or downtime."[7] and "SculpSure Body Contouring Treatments safely and

---

[7] https://www.cynosure.com/product/sculpsure/

effectively eliminate unwanted fat cells in just 25 minutes per treatment … Now you can provide patients with non-invasive body contouring that permanently reduces stubborn fat without surgery or downtime."[8] and "SculpSure in the world's first FDA-cleared laser device for non-invasive lipolysis of the abdomen, flanks, back, inner thighs, outer thighs, and submental area."[9]

84.     At the Aesthetics Exchange conference, CynoSure's representatives promoted the SculpSure as a revenue-generating device, touting its ease of use and the numerous customers it attracts.

85.     Intrigued by what he saw at the Aesthetics Exchange, Dr. Angelastro agreed to purchase the SculpSure from Cynosure.

86.     The SculpSure was financed by LCA Bank Corporation.

87.     The LCA Equipment Finance and Security Agreement (the "LCA Agreement") describes the SculpSure as the: 675-7026-006 SculpSure Non-Invasive Body Contouring Platform with SculpSure Submental Package. **A true and correct copy of the LCA Agreement is attached hereto as Exhibit E.**

88.     September 9, 2020, Dr. Angelastro signed the LCA Agreement and its accompanying Personal Guaranty. Ex. E.

89.     The purchase price of the SculpSure was $159,879.60. Ex. E.

90.     The LCA Agreement required payments of $3,459.95 for a period of sixty months. Ex. E.

91.     Upon receipt of the SculpSure, Plaintiffs found it to be difficult to operate and patients required uninterrupted monitoring while having the treatments.

---

[8] https://www.cynosure.com/product/sculpsure/
[9] https://www.cynosure.com/product/sculpsure/

92.     Throughout the sales period from June to September 2020, Cynosure's representatives consistently promised that the Cynosure products were easy to use and operate, safe for all patients, and the procedures could be performed with little supervision and monitoring.

93.     Although Cynosure's representatives emphasized the ease of the procedures and the use of its equipment, Plaintiffs soon came to realize that the Cynosure products were more complex than they had been led to believe, requiring significant training (both in-person and readings with tests) and were a drain on Plaintiffs resources and personnel.

### Cynosure's Marketing Package

94.     At all times material, Plaintiffs' patient base was comprised of individuals who needed routine medical care and walk-in clinic services such as sprains, cold and flu treatments, and drug and alcohol screenings.

95.     By starting an aesthetics practice, Plaintiffs hoped to provide aesthetics services to their already-existing patients and to attract new clientele.

96.     To the Plaintiffs, a major selling point to the Cynosure's products was the in-house marketing that Cynosure provided for an additional fee (the "Marketing Plan").

97.     Cynosure's Marketing Plan consisted of a program styled as the exclusive Amplified Marketing Practice Support program or AMPS, which Cynosure describes as: "Maximum impact with AMPS. Purchasing a laser is an investment in your practice. With Cynosure, your investment goes even further with our exclusive Amplified Marketing Practice Support program, AMPS. Not only will you have our innovative laser technology, you'll also get the benefit of increased patient visibility, turnkey marketing, and a dedicated support channel."[10]

---

[10] https://www.cynosure.com/for-providers/partnership-information/amps-program/

98. The AMPS program further promises, "Enhanced turnkey marketing materials. Downloadable and personalizable materials via our AMPS Advantage platform including in office marketing, advertising, PR, before and after images, website assets, video files, and more. E-learning tutorial led by industry experts on best practices for marketing your aesthetic lasers."[11]

99. As to Plaintiff, Cynosure's AMPS program did not live up to promises or expectations. For marketing materials, Plaintiffs primarily received brochures advertising expensive Cynosure treatments to distribute to patients.

100. Plaintiffs had to pay for the marketing materials.

101. Cynosure promised to create and did not create a web presence for Plaintiff or enhance Plaintiffs' already existing web page.

102. Plaintiffs, at their own expense, hired an in-house marketer to produce a stronger web presence, raise awareness of A Men and the available aesthetics procedures, and help grow the business.

103. Upon information and belief, Cynosure contracted or subcontracted with a company called Spark, a social media marketing and advertising agency ("Spark").

104. As to Plaintiffs, Spark's marketing assistance was to generate leads for new clients via social media, primarily Facebook.

105. Upon information and belief, Spark's lead generation was generalized as to aesthetics – not to A Men – and did not target potential customers in Plaintiff's geographic area.

106. Spark produced approximately 250 leads.

107. Upon information and belief, the leads that Spark generated were not actually leads in the sense that they captured potential clients' information and allowed for a sales call or other

---

[11] https://www.cynosure.com/for-providers/partnership-information/amps-program/

introductions to be made. Instead, the information that Spark identified as leads was actually information collected from Facebook from users who answered questions in a pop-up ad and not Facebook users who entered their information for the purposes of establishing a connection with Plaintiffs to learn more about aesthetics procedures.

108.    Plaintiffs diligently worked the leads, following the scripts provided by Spark or Cynosure.

109.    Of the approximate 250 Spark leads, not a single one led to a client.

110.    The Marketing Plan failed to assist Plaintiff in generating the necessary client base to maintain the payments on the Cynosure products.

111.    In December 2022, Plaintiff, desperate for the Cynosure products to develop some revenue, hired Marina Reed ("Reed"), a former Cynosure employee, as an in-house aesthetic marketer.

112.    Reed was an additional marketer hired specifically for Cynosure procedures.

113.    Plaintiff's own in-house marketing was the only way that Plaintiff generated any interest in and revenue from the Cynosure products, but it was not sufficient for Plaintiffs to meet the financial obligations on the Cynosure products.

114.    Plaintiffs made multiple calls to Spark to try to encourage better leads to no avail.

*Cynosure Products*

115.    Despite the promises of Cynosure's representatives that there was an unlimited market for aesthetics services, Plaintiffs – even when working with the Marketing Plan – could not generate enough interest in the procedures to break even much less realize a profit on the Cynosure products. As Dr. Angelastro on March 29, 2021, stated via text message to Kyle Shapero:

> Using any influence you [Kyle Shapero] have with lease partner to
> offer some deference of monthly payments or a more successful

marketing. I [am] sorry but after 170 cold leads nothing converted. I didn't jump into this to go bankruptcy, I was under [the] impression the business was there and I just need to get put out there with nurturing, and didn't think I needed my own patients to feed the aesthetics census to such a large degree?? Or I would have been more tepid up front. Anyway without some aid I'll only be to keep FP. UC, and cannabis going. Not sure if other sales have run into trouble pandemic as I'm sure it plays a role, probably more so as my clinic was new. I really was projecting new aesthetics to feed other party of practice not completely the opposite … so what ever is within your abilities … I'm listening.

**A true and correct copy of the March 29, 2021, text message is attached hereto as Exhibit F.**

116.    Cynosure's representatives repeatedly stated that the Cynosure products would realize an income of $20,000 per month.

117.    Cynosure's sales were riddled with fees and interest rates that were not disclosed by its representatives. As Dr. Angelastro on June 22, 2020, stated via text message to Cynosure representative Chris:

Morning Chris. Was able to get thru a good portion of Manuel's [manuals], and review contract rate. I was under impression I'd receive TempSure Firm handle then the Flexsure when it came out. From what I'm reviewing there is no Firm Handpiece unless I'm missing something??? Also simple interest rates are 54% for Icon and TempSure is 28% over 60 months … that is a windfall of cash for banks. Who also charged docstamps (ok with) and want a monthly service fee … and taxes.

**A true and correct copy of the June 22, 2020, text message is attached hereto as Exhibit G.**

118.    Relying on Cynosure's representatives' statements, Plaintiff considered the investment in the products and the payments thereon to be reasonable in light of the promised gain.

119.    Plaintiffs needed to perform 6-10 treatments on new patients per month to realize the promised $20,000 per month.

120.     Plaintiffs made use of Cynosure's products for approximately two years and in that time, Plaintiffs performed only 15-20 Cynosure procedures for which they were paid.

121.     As the issues with Cynosure's products, the promises made, and the Marketing Plan came to light, the Cynosure sales representative with whom Plaintiff had the most contact, Kyle Shapero, ceased all communication with Plaintiff.

122.     In approximately two years of use, Plaintiffs realized approximately $50,000 in revenue from Cynosure's products.

123.     The total for each machine, including lease interest and fees, was as follows:

    a.   The TempSure: $107,535.00. Ex. A.

    b.   The Icon: $169,000.00. Ex. B.

    c.   The Potenza: $244,147.00. Ex. C.

    d.   The SculpSure: $159,879.60. Ex. D.

    e.   **Total**: $680,561.60.

124.     Allowing for lease payments, cost of marketing materials, cost of supplies for the Cynosure products, time and energy spent in marketing, costs of extended warranties required by on the Cynosure products (required by insurance companies), and the cost of insuring the Cynosure products, the Cynosure products did not realize any gain but were a financial negative on Plaintiff's business. **A true and correct copy of the extended warranties invoice is attached hereto as Exhibit H.**

125.     In approximately two years of use, Plaintiff acquired 25 new patients for Cynosure procedures.

126.     Of those 25 patients, not a single one was secured from the Marketing Plan or Spark leads.

127.    The aesthetic packages that were sold to the 25 patients were deeply discounted per Cynosure's requirements.

128.    Because of the signification financial strain that the payments for the Cynosure products placed on Plaintiffs, A Men filed for Chapter 11 bankruptcy in the Middle District of Florida, Tampa Division, Case No.: 8-22-bk-02849.

129.    In order to pursue this action, Plaintiffs have secured the services of the below-signed counsel and must pay him a reasonable fee and associated costs for which Defendant should be responsible.

130.    All conditions precedent to this action have been performed or waived.

## COUNT I

### Fraud in the Inducement

131.    Plaintiffs restate and incorporate by reference paragraphs 1 through 129 as is fully stated herein.

132.    This is an action for Fraud in the Inducement which is plead in addition or in the alternative to the other counts in this Complaint.

133.    Cynosure acting through its representatives during the June 8, 2020, meeting falsely claimed that: (1) the use of the TempSure system would generate unlimited profits because of people spending billions on their personal appearance for social media; (2) Plaintiffs would realize $20,000 per month from the TempSure system; (3) the TempSure system required little or no employee supervision or patient monitoring; (4) the TempSure system was easy to use and safely operate; and (5) minimal training was necessary to become proficient in the Tempsure's operation.

134.    The representations and omissions made by Cynosure are false statements or omissions made concerning material facts in that: (1) the use of the Tempsure system was not

virtually painless for patients; (2) the Tempsure system could not be used without consistent monitoring and supervision of patients during aesthetics procedures; (3) the TempSure was not suitable for establishing a new aesthetics practice; and (4) the TempSure product did not serve Plaintiff's existing clientele.

135.    Cynosure, at the July 27, 2020, meeting falsely claimed that the Icon Workstation: (1) was essential to a new aesthetics practice; (2) would generate revenue and profits for Plaintiff; (3) the Icon could be operated without patient supervision and monitoring.

136.    The representations and omissions made by Cynosure are false statements or omissions concerning material fact in that (1) the Icon Workstation was not necessary to a beginning aesthetics practice; (2) it failed to generate revenue and profits for Plaintiffs even when working with the Cynosure Marketing Plan; and (3) several of the procedures for the Icon required the use of nitrous oxide mandating that Plaintiffs monitor and supervise sedated patients.

137.    Cynosure acting by and through its representatives, during the Late July phone call, falsely claimed that Potenza Workstation: (1) provided painless treatments to patients; (2) treatments could be performed with little or no patient supervision and monitoring; (3) that Potenza Workstation in conjunction with the Cynosure Marketing Plan would generate interest and revenue.

138.    At no time did Cynosure's representative make clear to Dr. Angelastro or any representative of A Men that the Potenza Workstation's procedures would require patients to be sedated under nitrous oxide or any other means of sedation or anesthesia on a frequent basis.

139.    The representations and omissions made by Cynosure are false statements or omissions made concerning material facts in that: (1) the use of the Potenza Workstation did not provide painless treatment to patients; (2) the Potenza Workstation's procedures required constant

patient supervision and monitoring; (3) the Potenza Workstation was not suitable for a budding aesthetics practice; and (4) the Potenza Workstation was not marketed in such a manner as to raise interest in existing clientele or to help generate new patients.

140.    Cynosure acting by and through its representatives during the Aesthetic Conference meeting falsely claimed that: (1) the SculpSure was virtually painless for patients; (2) easy to use and operate; (3) that the SculpSure could be operated with minimal patient supervision and monitoring.

141.    The representations and omissions made by Cynosure are false statements or omissions made concerning material facts in that: (1) the SculpSure was not virtually painless to patients as several complained of pain; (2) it was not easy for Plaintiff's staff to use and operate the SculpSure; (3) and patients required continuous monitoring and supervision while the SculpSure was being operated especially those sedated with nitrous oxide.

142.    At no time did a Cynosure representative make clear to Dr. Angelastro or any representative of A Men that the SculpSure's procedures would require patients to be sedated under nitrous oxide or any other means of sedation or anesthesia.

143.    Cynosure knew or should have known that its representations or omissions regarding the Cynosure products, as plead herein, were fraudulent because Cynosure's representatives artificially inflated the value and efficacy of the Cynosure products and of the Marketing Plan.

144.    Cynosure intended that its false statements or omissions would induce reliance for Plaintiffs to act upon them. Cynosure intended Plaintiffs' reliance so it could profit from the financing agreements that Plaintiffs executed. Cynosure sold products that did not meet its

representatives' representations or Plaintffs' expectations and did so without any risk of financial loss as the financing companies paid Cynosure for the Cynosure products.

145.    Acting in reliance on Cynosure's false statements or omissions, Plaintiff acted to purchase and finance TempSure, the Icon, the Potenza, and the SculpSure.

146.    Plaintiff suffered injury and damages as a result of their justifiable reliance on Plaintiffs false statements and omissions.

WHEREFORE, Plaintiffs request that this Court enter judgment for damages, prejudgment interest, costs, attorneys' fees, and for such other and further relief as this Court deems just and proper.

## COUNT II

### Violation of the Florida Deceptive and Unfair Trade Practices Act

147.    Plaintiff restates and incorporates by reference paragraphs 1 through 129 as is fully stated herein.

148.    This is an action for Violation of the Florida Deceptive and Unfair Trade Practice Act ("FDUPTA"), Fla. Stat. § 501.201 et seq., which is plead in addition or in the alternative to the other counts in this Complaint.

149.    FDUTPA prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive actions or practices in the conduct of any trade or commerce.

150.    Plaintiff is a "consumer" as defined by FDUPTA. Fla. Stat. § 501.203(7).

151.    Defendant engaged in "trade or commerce" as defined by FDUPTA. Fla. Stat. § 501.203(8).

152.    Defendant has engaged in unconscionable acts or practices and unfair or deceptive actions or practices, including, but not limited to, the following:

a.    Defendant deliberately misrepresented the value of the Cynosure products promoting them as a guaranteed moneymaker for the Plaintiffs.

b.    Defendant used the false and improper testimonial of the Physician to promote the Cynosure products as valuable for generating revenue and as necessary to a beginning aesthetic practice.

c.    Defendant systematically engaged in fraudulent and misleading conduct by promising that the Cynosure products would realize $20,000 per month with the knowledge that their products did not meet their customers' expectations.

d.    Promoting the Marketing Plan as an essential and valuable tool for growing an aesthetics practice using Cynosure products.

153.    Plaintiff relied on the representations of Defendant and its sales representatives to be fair and honest in its dealings, including, but not limited to, the representations that the Cynosure products would be simple to operate, perform for patients as described, that there would be sufficient training provided by Cynosure for the Plaintiffs to operate the Cynosure products safely and efficiently, that Cynosure-provided marketing would act to allow a small practice to include an aesthetics practice, and that the Cynosure products would be a financial gain for Plaintiffs.

154.    Cynosure did not live up to the representations of its representatives. Instead, Plaintiff received only rudimentary training on the Cynosure products rendering it difficult and unsafe to operate, the Cynosure Equipment's procedures required extensive time to supervise patients creating a strain on Plaintiff's small staff, Cynosure's marketing and the Spark lead-generation programs added nothing to Plaintiff's revenue, and the Cynosure products were a financial drain on Plaintiff.

155.   Upon information and belief, Cynosure's representatives were directed or instructed to inflate the potential profitability of the Cynosure products in such a manner as to mislead or deceive the Plaintiff as to the overall value and use of the Cynosure products to the detriment of Plaintiff.

156.   Upon information and belief, Cynosure's representatives were directed or instructed to inflate the usefulness and efficacy of the AMPS Program in such a manner as to mislead or deceive the Plaintiffs as to the overall value of the AMPS Program to the detriment of Plaintiff.

157.   Upon information and belief, Cynosure's representatives were directed or instructed to inflate the usefulness and efficacy of Spark in such a manner as to mislead of deceive the Plaintiffs as to the overall value of Spark to the detriment of Plaintiffs.

158.   The Cynosure products proved to be a further detriment to Plaintiffs because few, if any, of Plaintiffs' clients were willing to pay for the expensive treatments.

159.   The costs of maintaining the Cynosure products, the extended warranties on the Cynosure products, and the need for Plaintiff's additional time and capital spent on its own marketing efforts far outweighed the value of the Cynosure products to Plaintiff.

160.   Plaintiff has been damaged as a result of Defendant's violation of FDUPTA.

WHEREFORE, Plaintiff requests that this Court enter a judgment for damages, pre-judgment interest, costs, attorneys' fees, and for such other and further relief as this Court deems just and proper.

## COUNT III

### Fraudulent Misrepresentation

161.    restates and incorporates by reference paragraphs 1 through 129 as is fully stated herein.

162.    This is an action for fraudulent misrepresentation which is plead in addition or the alternative to the other counts in this Complaint.

163.    Defendant made false statements concerning material fact when, as described herein, it stated, acting through its representatives, that the Cynosure Products were invaluable to a growing aesthetics practice, that the products could be easily learned and required little or no supervision when treating patients, that the products would realize significant financial gain for Plaintiff.

164.    Defendant further misrepresented materials facts, as described herein, by allowing the Physician to make a testimonial as to the value of the Cynosure Products: including their ease of use and the promised financial gains.

165.    Defendant intended Plaintiffs to rely the statements of its representative and the Physician so as to induce Plaintiffs to purchase Cynosure products.

166.    Plaintiffs have been injured by relying on the fraudulent misrepresentations of Defendant.

WHEREFORE, Plaintiff requests that this Court enter a judgment for damages, pre-judgment interest, costs, attorneys' fees, and for such other and further relief as this Court deems just and proper.

## COUNT IV

### Negligent Misrepresentation

167.    Plaintiffs restate and incorporate by reference paragraphs 1 through 129 as is fully stated herein.

168.    This is an action for negligent misrepresentation which is plead in addition or in the alternative to the other counts in this Complaint.

169.    Cynosure, by and through its representatives, and the Physician, made a misrepresentation of a material fact when its representatives conveyed to Plaintiffs that the marketing provided by Cynosure would benefit Plaintiff's practice, help it grow its aesthetics practice, and show profitable results.

170.    Cynosure, by and through its representatives, and the Physician, made a misrepresentation of material fact as to the financial value of Cynosure products for Plaintiff's practice.

171.    Defendant, by and through its representatives, was negligent in making the representations because it knew or should have known that the representations were false in that the promises made by Cynosure's representations as to the ease of the Cynosure products' operation, the minimal supervision of patients, and their ability to generate revenue for the Plaintiff turned out to be patently false after Plaintiffs purchased the products.

172.    Cynosure, acting through it representatives, intended that Plaintiffs would rely on the negligent misrepresentations in order to sell Cynosure products so that Cynosure may enrich itself.

173.    Plaintiffs relied on Cynosure's negligent misrepresentations to their detriment before making the purchases of the Cynosure equipment.

174.    Plaintiffs suffered damages as a result of their reliance on Cynosure's negligent misrepresentations.

WHEREFORE, Plaintiff requests that this Court enter a judgment for damages, pre-judgment interest, costs, attorneys' fees, and for such other and further relief as this Court deems just and proper.

## COUNT V

### Unjust Enrichment

175.    Plaintiffs restate and incorporate by reference paragraphs 1 through 129 as is fully stated herein.

176.    This is an action for unjust enrichment which is plead in addition or in the alternative to the other counts in this Complaint.

177.    Plaintiffs directly conferred a benefit on Cynosure in the form of purchasing and financing the Cynosure products.

178.    Cynosure voluntarily accepted and retained the benefit conferred in that Cyosure received funds from the financing companies for Plaintiffs' purchases of the Cynosure products.

179.    It would be inequitable for Cynosure to retain the benefit conferred because the Cynosure products proved to be unsuitable for a beginning aesthetics practice, were difficult to use and operate, patients required continuous supervision and monitoring, the Cynosure products did not live up to representations made by Cynosure representatives, and they failed to generate revenue and value for Plaintiff's practice.

WHEREFORE, Plaintiff requests that this Court enter a judgment for damages, pre-judgment interest, costs, attorneys' fees, and for such other and further relief as this Court deems just and proper.

Dated the 25th day of September 2022.

**Respectfully Submitted**,

/s/      *Jake C. Blanchard*
Jake C. Blanchard, Esq.
Blanchard Law, PA
1501 Belcher Rd. S., Unit 6B
Largo, FL 33771
jake@jakeblanchardlaw.com
steve@jakeblanchardlaw.com
service@jakeblanchardlaw.com
Fla. Bar No.: 0055438
Plaintiffs' Counsel
